**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LAUFEN INTERNATIONAL, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:10-cv-199** |
| **v** | ) |
| | ) |
| **LARRY J. LINT FLOOR & WALL COVERING,** | ) |
| **CO., INC.,  JOHN G. POPELY** | ) |
| **and EDWARD LINT.** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending now before the Court is the MOTION FOR SUMMARY JUDGMENT BY

DEFENDANTS LARRY J. LINT FLOOR & WALL COVERING CO., INC., AND EDWARD

LINT with attached appendix.  Doc. # 39.  In support to their motion for summary judgment,

Defendants Larry J. Lint Floor & Wall Covering Co., Inc., and Edward Lint ("Lint Defendants")

also filed a brief in support (Doc. # 41), and a concise statement of material facts (Doc. # 42).

Also before the Court is the MOTION OF JOHN G. POPELY FOR SUMMARY JUDGMENT

with attached exhibits.  Doc. # 40.  In support of his motion for summary judgment, Defendant

Popely filed a memorandum of law (Doc. # 43), and a concise statement of material facts (Doc. #

44).  In opposition to both motions, Plaintiff Laufen International, Inc. ("Laufen") filed a

response to the Lint Defendants' motion for summary judgment (Doc. # 47), a response to the

Lint Defendants' concise statement of facts with attached exhibits (Doc. # 48), a response to

Defendant Popely's motion for summary judgment (Doc. # 49), a response to Defendant Popely's

concise statement of facts with attached exhibits (Doc. # 50), and a brief in opposition to both

motions (Doc. # 51).  The motions are now ripe for disposition.  For the reasons that follow, the

Lint Defendants' motion for summary judgment will be granted in part and denied in part.

Defendant Popely's motion for summary judgment will be granted.

## STATEMENT OF THE CASE

### 1.     Procedural history

Generally speaking, this case is a commercial breach of contract action involving the sale of goods, as well as tortious claims stemming from the parties' conduct.  Plaintiff brought this diversity cause of action against the Defendants pursuant to 28 U.S.C. § 1332(a), alleging five counts: 1) fraud and concealment, 2) conspiracy, 3) breach of fiduciary duty, 4) interference with contractual relations, and 5) breach of contract.  *See* Doc. # 1.  Counts I through IV are brought against all three Defendants, while Count V is brought against Defendant Larry J. Lint Floor & Wall Covering Co., Inc. ("Lint Tile")[1] alone.  The Lint Defendants and Defendant Popely respectively moved to dismiss Plaintiff's complaint, with Defendant Popely arguing that the Court lacked subject matter jurisdiction over the dispute (*see* Doc. ## 7 & 8), and the Lint Defendants arguing defects in averments of the complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6) (*see* Doc. ## 9 & 10).  Both motions were subsequently denied in memorandum opinions and orders by the Court.  Doc. ## 16 & 19.  Defendant Popely individually and the Lint Defendants collectively each answered the (Doc. ## 17 & 20) with denials of any wrongdoing.  Defendant Lint Tile also raised a counterclaim against Plaintiff for breach of contract.  Doc. # 20.  Plaintiff denied the counterclaim, and discovery commenced,

---

[1]     The Court will utilize the abbreviated reference "Lint Tile" for Larry J. Lint Floor & Wall Covering Co., Inc, consistent with references throughout the evidentiary record referring to the company.  At the same time, Larry J. Lint Floor & Wall Covering Co., Inc., is also referred as "Lint Floor" in other portions of the filings.  For the purpose of this memorandum opinion, "Lint Floor" and "Lint Tile" each refer to the same company, Defendant Larry J. Lint Floor & Wall Covering Co., Inc.

after which, the pending motions for summary judgment were filed.

## 2.    Factual background

The facts as recounted here are taken from Plaintiff's complaint (Doc. # 1), the Lint Defendants' Statement of Material Facts (Doc. # 42), the appendix to the Lint Defendants' motion for summary judgment (Doc. # 39), Defendant Popely's Statement of Material Facts (Doc. # 44), the appendix to Defendant Popely's motion for summary judgment (Doc. # 40), and Plaintiff's respective responses to Defendants' concise statements of material facts with attached exhibits (Doc. ## 48 & 50).  The facts and all reasonable inferences are viewed in a light most favorable to Plaintiff, the non-moving party.

Plaintiff Laufen International, Inc. ("Laufen") is a manufacturer of tile and has its principal place of business in Miami, Florida.[2]  Doc. No. at ¶ 1.  Defendant Lint Tile is a wholesaler and distributer of tile and has its principal place of business in Westmoreland County, Pennsylvania.  *Id.* at ¶ 2.  Defendant Edward Lint manages Lint Tile and is the son of Larry J. Lint, the owner of Defendant Larry J. Lint Floor & Wall Covering Co., Inc.  Defendant Popely was previously the regional sales manager for Plaintiff from February 2005 until July 31, 2008, and now works for Defendant Lint Tile.

The claims within the complaint arise from the previous commercial relationship of the parties that began in 2007. On or about March 25, 2007, Defendant Lint Tile submitted a credit application to Plaintiff in order to establish the ability to purchase Plaintiff's tiles and other

---

[2]    Laufen International, Inc., is one of several companies owned by a Spanish company called Roca Tile Group.  Doc. # 42 at ¶ 1.  At some point during the 1990s, Plaintiff Laufen acquired United States Ceramic Tile, an Ohio-based ceramic tile manufacturing company.  *Id.* at ¶ 2.  Thereafter, Roca acquired Laufen in 1999.  Doc. # 48 at ¶ 2.

goods on credit. At the time, Defendant Popely was employed by Plaintiff, and handled the Lint Tile account. In the course of conducting those responsibilities, Defendant Popely would communicate with Defendant Edward Lint. As a Laufen employee, Defendant Popely answered to Jorge Torres, the company's vice president of sales. Throughout 2007, Plaintiff and Defendant Lint Tile maintained a number of commercial arrangements, including the purchase and shipment of tile orders beginning in and around May 2007. Additionally, and directly at issue in the matter *sub judice*, Plaintiff and Lint Tile reached an agreement on or about June 28, 2007.

      a.     General structure of the June 28, 2007 agreement

The terms of the June 28, 2007 agreement between Laufen and Lint Tile are at the heart of the breach of contract dispute. In terms of the actual format of the agreement, it was apparently a single page document that was exchanged between the parties via facsimile transmission, and was signed by Defendant Popely on behalf of Plaintiff. Defendant Popely described the agreement as follows, that Lint Tile "was going to purchase so much material, in return [Plaintiff] was going to supply him some merchandising material." Doc. # 48, Popely Depo. Tr. at Tr. p. 35. As the Court will address *supra*, there are actually two different writings within the evidentiary record, and the parties disagree over which particular document memorialized the actual agreement. There is no dispute, however, that in either "version" of the agreement, Laufen offered several types of merchandising material support to Lint Tile, such as the purchase and installation of display racks in the Lint facility, and 500 sets of tile sample boards displaying the various types of Laufen tile being sold by Lint Tile under Lint Tile's own brand name. The display racks were installed at Lint Tile in either the latter stages of 2007 or

early 2008 (the record is not entirely clear in this regard) at an approximate cost to Plaintiff of $300,000.00. The sample boards, on the other hand, required more time to produce, and were manufactured by a third-party corporation, Brown Industries, Inc., in Georgia.

Under the agreement, if Lint Tile placed purchase orders for tile in an aggregate amount of $2,500,000.00, it would receive certain incentives, including merchandising support with an estimated value of $500,000.00, a rebate of ten percent (estimated to be $250,000.00), and an additional rebate of five percent for payment made within one year. For his part, Defendant Edward Lint testified that he was unaware of the requirement to purchase a certain volume of tile under the agreement. *See* Doc. No. 50, Depo. Tr. of Lint, at Tr. pp. 51-52.[3] Neither Plaintiff nor Defendant Popley shared in Defendant Lint's misapprehension regarding this term of the agreement, however.

For the reasons that follow, a variety of questions exist regarding the terms of the agreement, including, *inter alia*, the question of time in which the invoices were expected to be paid, the requisite amount of product to be ordered by the Lint Defendants in order to receive the benefit of the merchandising support from Plaintiff, and which party was responsible for the freight charges for delivery of the sample boards to the Lint Tile facility.

      b.      Two different versions of the agreement are referenced by the parties

As referenced above, the Court begins with the question of which document represents the written agreement itself. While the parties agree with the notion that an agreement was

---

[3]      According to Defendant Lint's deposition testimony, "Nobody ever told me that it was supposed to be ... 2.5 million until after. I would have never done it. I couldn't afford to buy 2.5 million dollars worth of tile. I just couldn't do it. ... I didn't know nothing about this 2.5 million dollar order." Lint Depo. Tr. at pp. 51-52.

reached on or about June 28, 2007, the terms of which were documented on a single page, there is a legitimate question reflected in the record as to which single page document actually memorialized the agreement, as there are two versions of the agreement document being advanced by the parties as the actual agreement.

One of the two versions of the agreement is proffered by the Lint Defendants, and is referenced throughout the record as Lint Deposition Exhibit 4, or "Lint Exhibit 4". Lint Exhibit 4 is generally organized into two parts, with an upper portion (containing typed language) and a lower portion (containing handwritten terms). *See* Doc. No. 42, Lint Concise Statement of Material Facts at ¶ 20. The Court notes that the upper portion of Lint Exhibit 4 and on the second version of the agreement, the version advanced by Plaintiff, are the same, and set forth the following:

ORDER
$     2,500,000

| | New Offer | |
| --- | --- | --- |
| | Description | Estimated Value |
| Pricing | No discount | |
| Merchandising | 500 nicer displays | $500,000 |
| Additional Marketing Support (rebate) | 10% | $250,000 |
| Terms | 5% | $64,167 |
| --------------------------------------------------------------------------------------------- | | |
| Total Promotion Value | | $814,167 |
| % of First Order | | 32.6% |
| % of Proj. One Year Sales | | 17.6% |

Doc. No. 39, Lint Deposition Exhibit 4, attached to Lint's Concise Statement of Material Facts at exhibit 5. The handwritten portion of Lint Exhibit 4 sets forth the following four terms which, according to Defendant Lint, were written by Defendant Popely:

Roca will pay for racks for the Roca Room.  30,000

Co-op a training seminar which will be held soon.

Hunting trip for Larry to be determined at later date.

6

```
Aprox. [sic] 20,000 - 30,000.

5% rebate for payment within 1 year of the date receiving
material
```

*Id.*  Contained under this fourth term was additional language, written by Defendant Lint, that

added to that term with the following, "of displays and samples not tile.  6-27-07.  Ship display

first."  *Id.*  Lint Exhibit 4 bears the signature of Defendant Popely.

The Lint Defendants' motion for summary judgment is predicated upon these handwritten

terms, especially the language written by Defendant Edward Lint himself purportedly prior to the

agreement being reached.  According to Defendant Edward Lint, "I wrote on the paper that Lint

Tile's payment to [Plaintiff] was not due until one year after receiving 'displays and samples not

tile.'" Doc. # 39-9, Lint Affidavit.  Defendant Edward Lint also testified as to his understanding

under the agreement, namely that he was "supposed to buy tile, they were supposed to give me

500 sets of boards, 500 sets of samples, I pay for everything after I receive all my sample boards

and displays.  A year after I received the sample boards and displays, I pay for them.  Case

closed, that's the deal."  Doc. # 50, Depo. Tr. of Lint at Tr. p. 49.

Plaintiff, on the other hand, disagrees that Lint Exhibit 4 represented the written

agreement, and points instead to a second document within the evidentiary record as the

agreement.  Plaintiff contends that the terms of the agreement are set forth in a different one-page

typed document that had been signed by Defendant Popely, and is contained in the evidentiary

record as Popely Deposition Exhibit 1, or "Popely Exhibit 1".  *See* Doc. # 48, Laufen's Response

to Lint's Concise Statement of Material Facts at ¶ 20; *see also*, exhibit 12 to Laufen Response.

For his part, during his deposition, Defendant Popely identified Popely Exhibit 1 as the written

agreement.   Unlike Lint Exhibit 4, the version of the agreement identified by Plaintiff and

Defendant Popely contains no handwritten terms, but did include the following type-written terms not included in the Lint version of the agreement:

> Orders that are shipped out of Roca warehouses Lint Tile will only charged $150
>
> Roca will pay for racking system (Lint Tile will give Roca invoice) $25,000 to $30,000
>
> Roca will honor the 5% rebate for 1 year from the date of the invoice
>
> Roca will pay for a trip for Larry Lint which would be used within 1 year. Hunting trip $20,000 to $30,000
>
> Roca will co-op 50% of a sale training seminar
>
> If Lint Tile places the USCT orders by June 29 no later than 3:00 PM, Roca will by [sic] Lint Tile a $25,000 Truck

Doc. # 48, Exhib. 12 to Plaintiff's Response to Lint Concise Statement of Material Facts ("Popely Exhibit 1"). Generally speaking, there is little variation between the handwritten terms of Lint Exhibit 4 and typed language of Popely Exhibit 1, as both contain references to a racking system, a 5% rebate, and a hunting trip for Defendant Lint's father Larry. The significant difference between the two is the handwritten addendum to the 5% rebate term of Lint Exhibit 4 in which Defendant Lint included the language regarding Plaintiff's condition to ship the displays before the one year time frame for the rebate would accrue.

      c.      Merchandising support: Display racks and sample boards

As noted above, the display racks and sample boards were manufactured by Brown Industries. The custom display racks were completed and shipped to Lint Tile between October and early November, 2007. The cost of the manufacture and freight to ship the displays to Lint Tile were paid by Laufen, and totaled slightly more than $300,000.00. The manufacture of the

sets of boards for Lint Tile were based upon specifications provided by Defendant Edward Lint, including particular dimensions corresponding to the display racks and graphics displaying Lint Tile images. The order originally envisioned 12,500 boards, as each of the 500 sets of boards were to be comprised of 25 sample boards. The manufacture of each board occurs in different phases, the printing phase of the board itself, followed by the sampling phase, during which the tile samples are cut to size and attached to the boards.

The production of the sample display boards themselves were beset by a number of occurrences that affected the time required to produce the sets. Some of these occurrences can be categorized as logistical in nature in that they occurred within the course of bringing the necessary materials together at the same time in order to create the boards. For example, the artwork for the boards was not generated by Brown Industries itself, but was provided to them. For some tile series, there was a delay with Brown receiving the artwork, including not receiving the artwork at all for certain series, which either delayed or precluded the creation of boards. Likewise, it appears that some delay was associated with the shipment of the tile to be attached to the boards from either Laufen or Lint Tile to Brown. While the arrangement originally involved the tile to be used in the sample display boards being provided to Brown by Laufen, Lint Tile shipped certain tile samples to Brown at the request of Laufen. Breakage occurred with the shipment of certain tile samples, which required replacement.

Other factors affecting the manufacturing process appear to stem from the disagreement between the parties regarding who would cover the freight charges associated with shipping the boards to Lint Tile. Defendant Lint Tile expected Plaintiff to pay the freight charges, while Plaintiff Laufen contends that it was the responsibility of Lint Tile to do so. As the result of a

combination of these factors, in the 12 - 18 months that followed the June 28, 2007 agreement, Brown Industries shipped less than a total of 100 sets of sample boards to Lint Tile.  It is unclear who paid for those deliveries, however (apparently it was either Plaintiff or Brown Industries itself).  What is clear is the fact that the Lint Defendants did not pay for the freight of those sets that were delivered.  The sets of boards that were manufactured by Brown Industries and not shipped to Lint Tile were stored in Brown's warehouse.  By 2008, so many sets of sample boards were stored at Brown in the meantime, that Brown was unable to manufacture any additional boards until those that had been produced were shipped.

  d. Arrangement for Lint Tile to distribute Laufen tile to Lowe's Home Improvement

  Apparently at some point beginning either in 2007 or early 2008, there was discussion of some kind of arrangement between the parties wherein Defendant Lint Tile would ship Plaintiff Laufen's tile products to Lowe's home improvement stores ("the Lowe's deal"), an arrangement that would have been economically beneficial for both Laufen and Lint Tile.  Under the agreement, Lint Tile would purchase and store Laufen tile that it would later sell to Lowe's stores.  Beyond this general description of this arrangement, scant detail is included in the record before the Court.  While the prospect of making the Lowes deal was not part of the June 28, 2007, agreement between Laufen and Lint Tile, the Court notes it here for two reasons.  The first is that as an extension of the commercial relationship between Laufen and Lint Tile, the Lowe's deal appears to have been taken into consideration by the parties in the interactions that occurred in the course of their dispute involving the June 28, 2007 agreement.  The second reason that the Lowe's deal is noted here is due to the fact that it is referenced in a number of email messages that were exchanged between the parties, messages that Plaintiff does contend are relevant to its

claims.

　　　e.　　Email exchanges between Defendants Lint and Popely

　　　Throughout a significant portion of both 2007 and continuing until July 31, 2008,

Defendant Popely was a regional sales manager for Laufen, and, as such, handled the account of

Lint Tile and dealt with Edward Lint on behalf of Plaintiff.[4]  During this period, a series of email

exchanges occurred between Defendants Edward Lint and Popely.  Plaintiff's claims, particularly

the tort claims alleged in Counts I - IV, are predicated in large part on these email exchanges.   In

particular, in the complaint, Plaintiff alleges that beginning in or around March of 2008,

Defendant Lint requested certain unauthorized credits and financial concessions from Defendant

Popely in exchange for a payment of $30,000.00 per year for six years.  *See* Doc. # 1 at ¶¶ 26 -

29.  The complaint further alleges that Defendant Popely agreed to this arrangement, and

improperly authorized financial credits and concessions for Defendant Larry J. Lint Floor & Wall

Covering's account with Plaintiff without Plaintiff's knowledge and consent.  *Id*.  Within the

evidentiary record, Defendants Popely and Lint engaged in email correspondence with one

another discussing that which appears to be personal intentions regarding potentially working

with one another much earlier than March 2008.

　　　1)　　Defendant Lint courting Defendant Popely in June 2007

　　　Prior to the June 28, 2007 agreement being reached between Laufen and Lint Tile, the

_____

　　　[4]　　The circumstances under which Defendant Popely left the employ of Plaintiff are
only briefly described in the record.  For his part, Defendant Popely testified during his
deposition that Plaintiff eliminated the regional sales manager positions at that time.  *See* Doc. #
39-10, Depo. Tr. of Def. Popely at Tr. p. 20.  Building upon that point, Plaintiff notes that
Defendant Popely was offered a position to remain employed with Laufen in Miami, Florida, an
offer which was declined.  Doc. # 50 at ¶ 9.

following email exchange occurred between Defendant Edward Lint and Defendant Popely on

June 14, 2007:

> Defendant Lint to Defendant Popely, "`are you ready to join the team
> over hear [sic]`";

Defendant Popely in response:

```
Hey
What do you think about today.
I hope we can do it, I think we are the right company for
you for now and in the future growth.  You will benifit
[sic] from the inventory in the states.
Just think about it.  You can ship direct right out of
warehouse.
About joining your team (let's talk)
Johnny Roca
```

Doc. # 48, exhibit to Plaintiff's Response to Lint Defendants' Conc. Stmt. at p. 48-20.

>    2)    Series of messages from November 2007

On November 14, 2007, Missy Irwin, a corporate credit and payroll manager for Plaintiff

forwarded an email message to Jorge Torres that was apparently sent from Defendant Edward

Lint to Laufen (the originating Lint email itself was not included in the record).  Torres

responded to Irwin, with a carbon copy of the message to three other individuals including

Defendant Popely, on the same day, with the following:

```
His terms on the order were 30 days.  Then he said 30
days from receiving the tile, then 30 days from
receiving the displays.  Now he says, one year.
We need to go see him and settle this.
```

Defendant Popely responded with the following:

```
Jorge
I will talk to Eddy to start making payments
I give you an update when I have some kind answer
```

Doc. # 48, Plaintiff's Response to Popely's Conc. Stmt., at Popely Dep. Ex. 20.  Shortly

thereafter, the following email exchange occurred between Defendants Popely and Lint, also on

November 14, 2007, with the following message from Popely to Lint:

> ```
> I talked to Joe
> I am going to travel with him in the next couple weeks
> Who covers from Madison to Erie
> Also let's put a game plan for Jorge so when we make
> the move we are in good standing with Roca
> We are on the same page so it should be easy.  Let's
> get a date from Bruce
> ```

Defendant Lint responded to Defendant Popely on the same day with the following:

> ```
> One thing I told you I have one year to pay for after I
> get the displasys [sic] and samples what good did it do
> to have all the tile in my warehouse if I can't sale it
> after we get the samples and get it on the road I will
> start to pay for don't try to f me out of my.  Rebate
> just look if you as good as you say you are we will need
> to reorder all this tile in feb so if this is the case he
> will be paid in feb what do you think of this
> ```

To which Defendant Popely promptly responded with:

> ```
> No prob
> Like I said we are on the page
> I was talking about making them happy
> ```

The sequence continued:

> Defendant Lint to Defendant Popely, "Do I have the lauffen [sic] line";
>
> Defendant Popely to Defendant Lint, "I don't think you can handle the responsibility of the line";
>
> Defendant Lint to Defendant Popely, "Why do you think you are comming [sic] to work for me.  I hope you can handel [sic] it";
>
> Defendant Popely to Defendant Lint, "What";
>
> Defendant Lint to Defendant Popely, "Can't you read";
>
> Defendant Popely to Defendant Lint, "I can read but I can't believe what you said";

Defendant Lint to Defendant Popely, "`Did you eat yet and is it good`";

Defendant Popely to Defendant Lint, "`I can do it[.] I did eat[.] Do you think I can do it`".

Doc. # 48, Plaintiff's Response to Lint Defendants' Conc. Stmt., at Popely Dep. Ex. 22.

       3)      Email exchanges from February - April 2008

An email exchange occurred on February 26, 2008, between Defendant Lint and Defendant Popely that obliquely referenced future business dealings between the two.

Defendant Popely to Defendant Lint: "`We need to sell in New York I have a list of dealers and contractors`";

Defendant Lint To Defendant Popely:

`No problem hear is how it works I get the [expletive deleted] in the build it will be you and lindsay job to push it out I always said we should sale tile where we can get it there the next day and we can do it in ny`

Defendant Popley to Defendant Lint, "`Let's do it`";

Defendant Lint to Defendant Popely, "`I am ready you are the slacker`";

Defendant Popely to Defendant Lint, "`I am quitting tonight`".

Doc. # 48, Plaintiff's Response to Lint Defendants' Conc. Stmt, at Popely Dep. Ex. 28. The email correspondence continued with the following message from Defendant Lint to Defendant Popely on March 3, 2008:

`In 3 months we will be very busy so hear i[s] the deal`
`1`[st] `give me my 30k for the hunt this week`
`2 nd give me my 15% on what I paid you last year apx 60k`
`3 rd my 10k in gift card for last month`
`4`[th] `if we get a busy as I hope I will order 10 truck everyweek [sic]`
`and you give me 10k per week for the rest of the year apx`
`$520,000.00 and I will kick you 30k for you[r] sons [sic]`
`collage [sic] every year till he is out 6 year min`

Doc. # 39, Lint Defendants' Conc. Stmt. of Material Facts at Ex. 7, Popely Ex. 34.

Approximately three weeks later, on March 26, 2008, Defendant Lint sent the following

email message to Defendant Popely regarding the Lowes deal:

```
Did jorge call of email I need this bad.  Will make you
a deal if you have me the lowes deal by noon on thur I
will pay your sons coallage [sic] bills if we have the
deal for 2 year you get 2 years if we have lowes for 3
year you get 3 years only 1 chech [sic] we have to do bis
with them not just a few boxes I no how you think
I told bruce I was almost ready to through [sic] him out
of our sandbox and he best stop [expletive deleted]
around with this [expletive deleted]
Up to 25k per year so now I am going to see how good you
really are go get getter
```

Doc. # 48, Plaintiff's Response to Lint Defendants' Conc. Stmt. at Popely Dep. Ex. 39.  Earlier

in the day on March 26, 2008, Defendant Popely, along with apparently a number of other

regional sales managers, received an email from Laufen employee Ruben Canalda, which stated:

```
All

We have 4 containers of TIBURON VANILLA 12X12 ready at
Brazil.  We need sales this month.  Is there anybody that
can get this 4 containers at a minimum price of $.49
F.O.B. port of entry (east coast)?  We need to receive
the P.O. before Monday.

As I said, $.49 is the minimum price.  If you can get a
better deal, do it.

Please, let me know if any of you [sic] customers will
accept this deal.
```

*Id*. at p. 48-19.  Upon receiving this message, Defendant Popely forwarded the message to

Defendant Lint, adding the additional language of "Let me know if you are interested".  *Id*.[5]

---

[5]      There is no further indication within the record of what, if anything, ever
happened with respect to this tile, and Laufen's desire to sell the tile at a certain minimum price.

On April 2, 2008, Defendant Lint once again referenced the prospect that Defendant

Popely consider becoming employed by Lint Tile as well as his desire to procure the Lowes deal

with the following email:

```
Betweene [sic] me and you if you get into a big fight
down there just leave and you can start over hear [sic]
anytime get the lowes through first thow [sic] but if
you can't don't worry adout [sic] it we will get it
some day have a nice time
```

Doc. No. 39, Lint Defendants' Concise Statement of Material Facts at Ex. 7, Popely Ex. 40.  On

April 4, 2008, Defendant Popely sent the following to Defendant Lint:

```
Eddy

They are still thinking about the Lowes deal
I will talk to you about the details
Are you ready for me and Gary
We would better serve you when are on your team
I am done so is Gary
I am excited about the change
```

Doc. # 48, Plaintiff's Response to Lint Defendants' Conc. Stmt. at Popely Dep. Ex. 41.

**Standard of Review**

A court may grant summary judgment when "the pleadings, the discovery and the

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

A fact is "material" if its existence or non-existence would affect the outcome of the suit under

governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a

reasonable jury could find in favor of the non-moving party regarding the existence of that fact.

*Id.* at 248-49.  "In considering the evidence, the court should draw all reasonable inferences

against the moving party." *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007). However, while the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather its response must-by affidavits or as otherwise provided in [Rule 56]-set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

## LEGAL ANALYSIS

In view of the fact that the heart of this dispute involves the June 28, 2007 agreement, the Court will first address Defendant Lint Tile's motion for summary judgment regarding Count V, the breach of contract claim.

**A.      Count V: Breach of Contract**

Defendant Lint Tile, the only Defendant against whom Count V is directed, moves for summary judgment on the basis that Plaintiff materially breached the contract by failing to perform its obligations, which, in turn, legally relieved Lint Tile of its obligations under the agreement. *See* Doc. No. 41, Lint Defendant's Brief in Support at pp. 8 - 14. While the logic of such an argument may be sound, the factual predicate upon which that argument is made is hardly as clear as the Lint Defendants contend.

From the perspective of Lint Tile, the material terms at issue involve the merchandising support envisioned within the contract, more specifically, the 500 sets of sample boards. Defendants' position in their motion for summary judgment is structured as follows:

> In consideration for Lint Floor's tile orders, Plaintiff promised to supply Lint Floor with 500 display racks and 500 sets of sample boards at "no charge." (*See* CSMF ¶ 9.) Plaintiff estimated the value of the display racks and boards at $500,000. (*See* CSMF at ¶ 21.) Plaintiff offered to supply the racks and boards at "no charge," and Lint Floor accepted Plaintiff's offer by placing orders for more than $1 million in tile.

(*See* CSMF ¶ 11.)  There is no genuine issue of material fact that Plaintiff's agreement to supply display racks and sample boards was a material term of Plaintiff's contract with Lint Tile.  There is also no genuine issue of material fact that Plaintiff, after delivering the 500 display racks and the first 75-100 sets of sample boards to Lint Floor at "no charge," refused to deliver any more sample boards at "no charge."  (*See* CSMF ¶¶ 27-31.)  Finally, there is no genuine issue of material fact that the sets of sample boards were not completed when Plaintiff ordered Brown to stop delivering the boards to Lint Floor.  (*See* CSMF ¶¶ 32-36.)  Accordingly, as a matter of law, Plaintiff committed a material breach of contract that discharged Lint Floor from all liability under the contract.

Doc. # 39-3 at pp. 8 - 9 (references to the record original).  While the structure of this argument may be legally coherent, the problem for Lint Tile, at least in terms of whether summary judgment is appropriate, arises in the evidentiary support, or lack thereof, for the factual predicate upon which the argument is reliant.

In support of its argument for summary judgment, Lint Tile repeatedly invokes specific language that Plaintiff agreed to "supply 500 displays at no charge."  *See* Doc. # 41, Lint Defendants' Brief in Support of the Motion for Summary Judgment, and Doc. # 42, Lint Defendants' Conc. Stmt., at ¶¶ 9, 21, and 26 - 27.  That specific language, however, is not set forth in either of the two conflicting versions of the June 28, 2007 agreement, and actually came from an earlier written proposal from Laufen to Lint Tile in May 2007[6], *see* Doc. # 39-5, Torres Depo. Ex. 5, a proposal that was subsequently revoked and did not result in an agreement.  Doc. # 42 at ¶¶ 12 & 13; *see also*, Doc. # 48-2, Depo. Tr. of Edward Lint, at Tr. pp. 49 - 50.  The

---

[6]     On or about May 30, 2007, Defendant Popely, on behalf of Plaintiff, sent Defendant Edward Lint a document identified as "Lint Tile First Order Agreement Letter May 07".  Doc. # 39-2 at ¶ 9.  That document noted, in relevant part, that Plaintiff "will supply 500 displays at no charge."  *Id*.  The document further noted that Plaintiff would pay a rebate to Lint Tile after the first order was shipped, and that the rebate would be either 20 % or 30 % depending upon the type of tile ordered by Lint.  *Id*.  Additionally, Plaintiff offered a price discount for Lint Tile of, once again, 20 % or 30 % depending upon the type of tile ordered.  *Id*.

Court notes this subtle point for the purpose of precision in considering whether no genuine issues of material fact, as Defendant Lint Tile argues, exists with respect to the terms of the agreement that was subsequently reached.

Beyond that qualification, however, Lint Tile's position is supported by a number of facts that are not in dispute. Lint Tile did not receive any sets of sample display boards until the summer of 2008, more than a year after the date of the agreement, and even then, it received less than 100 of the 500 sets it was expecting. In addition, by the summer of 2008, a number of series of tile products that were previously ordered by Lint Tile (for which it was still awaiting sample boards) had been discontinued by Laufen, effectively defeating the purpose of any benefit of having the sets of sample boards for those partiuclar products. Specifically referencing the issue regarding the freight charges, of the relatively few sets of boards that were delivered, it was Plaintiff who either paid the freight, or arranged with Brown Industries to pay the freight. Lint Tile argues that Plaintiff's effort to satisfy payment of the freight expenses for the sample display boards was consistent with fact that Plaintiff was to have incurred all costs associated with the custom display racks that were installed at Lint Tile, including freight.

Not surprisingly Plaintiff disagrees, and characterizes the dispute here as one in which Lint Tile is the party who has failed to perform under the contract, specifically contending that Lint Tile failed to pay invoices when they were due in late 2007, and that Lint is only now invoking the non-delivery of the sample display boards to justify non-payment. *See* Doc. # 51. More particularly, Plaintiff's opposition to the Lint Defendants' motion for summary judgment presents somewhat of a multilayered response. On one hand, according to Plaintiff, the terms of the agreement from the outset included the obligation of Lint Tile to pay the invoices for the tile,

and that the payment due date was not conditioned upon the production of the sets of sample display boards. In support thereof, Plaintiff notes the record evidence that on November 14, 2007, Jorges Torres raised his concern with Defendant Popely through email over the fact that the invoices had not been paid. It was not until the following day, according to Plaintiff, that Defendant Edward Lint began to contend that payment was not due until after the display boards had been manufactured and received by Lint Tile. *See* Doc. # 48, Plaintiff's Response to Lint Defendants' Conc. Stmt., at Popely Dep. Ex. 22. In furtherance of that which Plaintiff essentially contends is a stalling tactic, the Lint Defendants refused to cover the freight charges for the sets of sample display boards, which resulted in the sets of boards not being delivered to Lint Tile, which had the additional effect of causing Brown to stop the production of the boards because the boards that had been manufactured were over-crowding Brown's storage space.

Beyond that, Plaintiff notes that the June 28, 2007 agreement included a $2,500,000 minimum order requirement by Lint Tile to warrant the claimed marketing support, and that amount was never reached. Plaintiff contends that Lint Tile was aware of the minimum order requirement because it was from that threshold amount that the monetary value of the incentives were to be derived. For example, on the written agreement itself (under either party's version), the 10% rebate was estimated to have a monetary value of $250,000.00. Because Lint Tile never made the requisite amount of orders to reach the minimum amount, Plaintiff contends that Lint Tile failed to satisfy this condition precedent for either the rebate or the merchandising support, and therefore, is not entitled to either.

In sum, the Court finds that genuine issues of material fact are patently obvious with respect to the breach of contract claim. As such, Defendant Lint Tile's motion for summary judgment on Count V of Plaintiff's complaint will be denied.

**B.      Counts I and II: Fraud & Concealment (I) and Conspiracy (II)**

Plaintiff brings four tort claims against the Defendants at Counts I through IV. Plaintiff's basis for these claims arise from the series of email messages between Defendant Edward Lint and Defendant Popely while the latter was still employed with Plaintiff. More specifically, Count I alleges a common law claim of fraud and concealment, while Count II alleged a claim of a conspiracy between Defendants Edward Lint and Popely. Given the factual and legal similarities between the two counts, the Court will consider Counts I and II together.

As this Court previously noted in denying the Lint Defendants' motion to dismiss, fraud generally consists of any action or conduct that is calculated to deceive, whether by single act or combination or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. *See Tyler v. O'Neill*, 994 F.Supp. 603, 612 (E.D. Pa 1998)(citing *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1333 (3rd Cir.1995); *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289 (3rd Cir.1991)). As a general rule, to prove fraud or intentional misrepresentation, a plaintiff must demonstrate: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); *Gruenwald v. Advanced Computer Applications*, 730 A.2d 1004, 1014

(Pa.Super.1999); *see also Bortz v. Noon*, 556 Pa. 489, 500-501, 729 A.2d 555, 561 (1999). Likewise, the tort of intentional non-disclosure is similar and has the same elements as fraud, except that in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation. *GMH Associates, Inc. v. The Prudential Realty Group*, 752 A.2d 889, 901-902 (Pa.Super.2000).

Fraudulent misrepresentation must be proven by clear and convincing evidence as opposed to the lower preponderance of the evidence standard. *Snell v. Commonwealth, State Examining Board*, 490 Pa. 277, 281, 416 A.2d 468, 470 (1980); *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 72 F.Supp.2d 547, 551 (W.D.Pa.1999). Pennsylvania law requires a trial judge to decide as a matter of law before a case is submitted to a jury whether a plaintiff's evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case. *Northeastern Power Co. v. Balcke-Durr, Inc.*, 49 F.Supp.2d 783 (1999), citing *Mellon Bank v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399, 1409 (3d Cir.1991) (quoting *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir.1981)). In other words, clear and convincing evidence of fraud must exist. *See Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir.1991).

Civil conspiracy occurs where two or more persons combine or agree with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979); *Doe v. Kohn, Nast & Graf, P.C.*, 862 F.Supp. 1310, 1328 (E.D.Pa.1994). The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance

of the common purpose, and (3) actual legal damage.  *See Phillips v. Selig*, 959 A.2d 420, 437

(Pa.Super.2008).

Plaintiff contends that as one of its employees, Defendant Popely was responsible for the

credit account of Defendant Lint Tile (a fact that is not in dispute).  Further, Plaintiff alleges that

Defendant Lint Tile accumulated a significant account balance on goods purchased from Plaintiff

beginning in 2007 and continuing through much of 2008, a balance that apparently has not been

paid (again, this also is not in dispute).  Against this backdrop, the claims for Counts I and II rest

upon Plaintiff's allegation that on or about March 3, 2008, Defendant Edward Lint, on behalf of

Defendant Lint Tile, offered terms to Defendant Popely to personally pay Popely in exchange for

credits and concessions Popely would arrange with Plaintiff for the account receivable.  In

support of this claim, Plaintiff alleges the following in the complaint:

> 41.    Defendants made knowing, intentional and material representations to
>         Plaintiff about the credits and concessions, in particular asserting that the
>         credits and concessions are valid and justified, when they know that the
>         credits and concessions were obtained without Plaintiff's authorizations as
>         part of a scheme to defraud Plaintiff.
>
> 42.    Defendants have misrepresented and concealed the relationship between
>         Popely and the other defendants, and have concealed and misrepresented
>         that the credits were obtained by virtue of illegal kick-backs and/or bribes
>         to Popely.

Doc. # 1.  In other words, in Plaintiff's view, Defendants Edward Lint and Lint Tile asserted

credits and concessions in their dispute with Plaintiff to which they were not entitled, knowing

that such assertions were made as part of a fraudulent scheme they shared with Defendant

Popely.  As evidentiary support for this claim, Plaintiff points to the email exchanges between

Defendants Popely and Lint as a chronicle in which Defendant Lint "explicitly offers monetary

payments to Popely for deals, discussions of Popely staying at Laufen in order to get the Lowe's deal, and Popely forwarding Laufen internal emails which explicitly indicate that they should not be forwarded to customers." Doc. # 51 at § III.C.1. (footnotes omitted). The factual predicate underpinning the conspiracy claim in Count II is the same as that of the fraud and concealment claim of Count I, namely an understanding for Defendant Popely to receive payments in exchange for arranging for credits and concessions for Lint Tile's credit account. *See* Doc. # 1 at ¶¶ 24 - 38.

The Lint Defendants argue that Plaintiff has failed to develop record evidence to establish either fraud and concealment or conspiracy. *See* Doc. # 41 at FN 5 ("Plaintiff has no evidence to support its tort claims, only suspicion.") More specifically, the Lint Defendants contend that the "central allegation of Plaintiff's fraud claim - the Defendants knew the credits and concessions were obtained without Plaintiff's authorization - Torres, the only person with authority to grant credits and concessions, admitted that he authorized every credit and concession offered or given to Lint Floor." Doc. # 41 at § III. Likewise, Defendant Popely argues the same point, that he did not have the authority to commit Plaintiff to any financial incentives (only Jorge Torres did), and that Torres did, in fact, authorize the incentives in order to facilitate the Laufen deal with Lint Tile. Doc. # 43 at § III.A. The Lint Defendants further argue that Plaintiff has failed to adduce any evidence of a fraudulent misrepresentation by Defendant Edward Lint. Doc. # 41 at § III. To that end, the Lint Defendants note:

> When asked to identify all of the misrepresentations made by Defendants to Plaintiff, the only misrepresentation that Torres identified was some assurance allegedly made by Ed Lint at some point in time that Lint Floor would pay Plaintiff when the sample boards were done. Asked what evidence Plaintiff had that Ed Lint did not intend to

pay Laufen when he made the alleged promise, Torres said: "[Laufen] didn't receive payment."

Doc. # 41 at § III (internal citations omitted).

In opposition to Defendants' motions for summary judgment, Plaintiff argues that the "evidence is sufficient to establish that Popely accepted Ed Lint's promises of monetary payments and a job in exchange for delivering deals to Ed Lint that were unfavorable to Laufen." Doc. # 51 at § III.C. Plaintiff also argues that the email correspondence is circumstantial evidence of these torts because they reflect offers of monetary payments and positions of employment to Defendant Popely by Defendant Lint in exchange for Defendant Popely's assistance with achieving the Lowes deal for Lint Tile. *Id.*

Plaintiff's opposition to Defendants' respective motions for summary judgment fails for a couple of reasons, which the Court will address *ad seriatim*.

 1) Count I: Fraud and Concealment

The Court begins its consideration of the Defendants' motion for summary judgment on Count I with the question of whether the evidence is sufficient to establish fraudulent behavior or actionable concealment by the Defendants. The Court finds that it does not. To meet its burden of proving a material issue of fact, Plaintiff must present evidence from which a jury could find by "clear, precise, and indubitable" evidence, *Glanski v. Ervine*, 269 Pa.Super. 182, 409 A.2d 425, 430 (1979) that Defendant Lint knew that any alleged misrepresentation made to Plaintiff regarding an intention to pay the invoices was false at the time that it was made. *Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 499 A.2d 282, 286 (1985). *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. at 252–54, 106 S.Ct. at 2512–13 (evaluation of evidence must be made in light of applicable burden of proof).  The evidence of record does not meet this burden.

While the email correspondence obviously chronicles discussions between Defendants Lint and Popely, including offers of payment of money from Defendant Lint to Defendant Popely and the prospect of Popely coming to work for Lint Tile, there is no evidence that those discussions had any detrimental effect on Plaintiff.  There is no record evidence that Defendant Lint ever paid any money to Defendant Popely under the auspice of the exchanges that occurred in the emails from March 2008.  Likewise, there is no evidence that Defendant Popely obtained any benefit from the Lint Defendants during or as the result of this correspondence.  The terms of the agreement in dispute in the breach of contract claim involve the June 28, 2007 agreement.  While the parties disagree on the meaning and effect of those terms, there is no evidence of subsequent credit or concessions committed on behalf of Plaintiff to Defendant Lint Tile by Defendant Popely.  Plaintiff has adduced no evidence that Defendant Popely even had any such authority.  There simply is no evidence of any concession or credit related to the June 28, 2007 agreement being obtained by the Lint Defendants following these email exchanges with Defendant Popely.  While the language of those email exchanges raised the suspicion of Laufen, the evidentiary record does nothing to establish any support for a fraud and concealment claim beyond suspicion.

The fact that Defendant Popely began working for Lint Tile following termination of his employment with Laufen does not change this determination.  The email exchanges of record regarding the prospect of Defendant Popely going to work for Defendant Lint occurred in 2007 and through April of 2008.  Several months later, Plaintiff eliminated all of its regional sales

manager positions, which in turn, led to Defendant Popely losing his job with Laufen on July 31, 2008.  For Plaintiff to point to the fact that Defendant Popely subsequently became employed by Lint Tile as evidence of the alleged fraudulent scheme is an example of faulty *post hoc ergo propter hoc* reasoning.  The record is clear that the following sequence occurred: Defendants Lint and Popely discussed Popely coming to work for Lint unbeknownst to Plaintiff; Plaintiff, on its own accord, makes a business decision to eliminate the position of Popely and other regional managers; and, after losing his job, Popely becomes employed by Lint.  Plaintiff now contends that the previous discussions between Lint and Popely establishes that Popely's departure from Laufen was pursuant to a fraudulent scheme.  There is simply no evidence of fraud in this sequence.  There is no evidence that in anticipation of the move, Defendant Popely "feather-bedded" his prospective position with Lint Tile by utilizing his Laufen position in order to obtain any actual benefit, in the form of credits or concessions, for Lint.  While Defendant Edward Lint was hoping that the Lowe's deal between Lint Tile and Laufen would be approved, as it apparently was, there is no evidence to suggest that Defendant Popely had any input, much less influence, in that outcome.  There is only speculation in that regard.  Likewise, there is no evidence that Defendant Popely improperly converted any proprietary information or resources of Laufen in order to benefit Lint Tile in anticipation of his termination by Laufen.

The effect of this same dearth of evidence applies to Plaintiff's concealment claim. While discussions clearly occurred, there is no evidence to support the notion that those discussions were materially detrimental to any transaction between Lint Tile and Laufen.

Even beyond the lack of evidentiary support for the prima facie case of fraud and concealment, the Defendants' are correct that Count I is barred by the "gist of the action"

doctrine.  Pennsylvania's gist of the action doctrine is a common law doctrine "designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.Ct.2002) (*citing Bash v. Bell Tel. Co.*, 411 Pa.Super. 347, 601 A.2d 825 (Pa.Super.1992), rev'd on other grounds by *Keefer v. Keefer*, 741 A.2d 808, 812 (Pa.Super.Ct.1999)).  "Generally, the gist-of-the-action doctrine precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship." *Sullivan v. Chartwell Investment Partners, LP,* 873 A.2d 710, 718 (Pa.Super.2005).  "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Authority of Cambria County v. International Insurance Co.*, 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (en banc), *quoted in Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103 (3d Cir.2001).  Accordingly, a claim is limited to contract law when "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Bash v. Bell Telephone Co.*, 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).[7]

Tort actions lie for breaches of duties imposed by law as a matter of social policy, whereas contract actions lie only for breaches of duties imposed by consensual agreements between particular individuals.[8]  *Id.*  Thus, a claim is limited to a contract claim "when the

---

[7]     *See also Koresko v. Bleiweis*, 2004 WL 3048760, *3 (E.D.Pa. Dec. 30, 2004) (observing that the existence of a contractual relationship is not dispositive in determining whether a tort claim may lie; rather, the essential question is the violation of an additional duty distinct from the contractual obligations) (citing *Bohler-Uddeholm* ).

[8]     Although the Pennsylvania Supreme Court has not expressly reviewed the concept of the "gist of the action", it has recognized the problems inherent in allowing a party to proceed

parties obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." *Hart v. Arnold*, 884 A.2d 316, 339-40 (Pa.Super.Ct.2005). If, on the other hand, the contract is merely collateral to the wrong described, the existence of a contract does not prevent recovery in tort. *eToll*, 811 A.2d at 14. Thus, the Pennsylvania Superior Court has frequently applied the gist of the action doctrine to claims for fraud in performance of a contract, but not to claims for fraud in the inducement. *See Sullivan*, 873 A.2d at 719 ("Following a thorough analysis of the issue, the *eToll* Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract.")

Pennsylvania courts have recognized four areas where the gist of the action doctrine precludes recovery in tort: (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim. *Id.* at 19 (citations omitted). As the parties know, the Lint Defendants previously moved to dismiss this claim prior to the start of discovery. Doc. No. 9. Based upon its review of Plaintiff's complaint, and accepting as true the facts as pled therein at the time, the

with both tort and contract claims for harm that arose in connection with a contractual relationship. *See Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (Pa.1964); *see also Pediatrix Screening, Inc. v. Telechem Intern. Inc*, 602 F.3d 541 (3d Cir., 2010). The Pennsylvania Superior Court has "operated under the assumption that the gist of the action doctrine is a viable doctrine that will eventually be explicitly adopted by [the] state's High Court." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa.Super.Ct.2007)(citations omitted). The Court of Appeals for the Third Circuit likewise has adopted that view. *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001).

Court concluded that the torts allegedly committed by the Defendant were not inextricably entwined with the agreement between the parties. Obviously, now the Court has an evidentiary record from which it can assess the application of the doctrine.

Here, the Court finds that Plaintiff's claims of fraud and concealment are intertwined with its breach of contract claim. The June 28, 2007 agreement is at the heart of Plaintiff's fraud claims, not collateral to it. The duties alleged in the breach, namely Defendant Lint's obligations to pay, and likewise Plaintiff's duty to provide merchandising support, were created and grounded in the contract itself. At best, the underpinnings of Plaintiff's fraud and concealment claim concerns the performance of contractual duties. The alleged fraud at issue was not so tangential to the parties' relationship so as to make fraud the gist of the action. Accordingly, Defendants' motion for summary judgment will be granted as to Count I.

2) Count II: Conspiracy

Turning to Plaintiff's claim of conspiracy, Plaintiff must adduce such evidence to demonstrate that Defendants Lint and Popely agreed to either perform an unlawful act, or a lawful act by unlawful means, and that actual damages occurred as a result. For the same want of evidence to independently establish a claim of fraud and concealment, there is no such evidentiary support for the claim of conspiracy in the record before the Court. As the Pennsylvania Superior Court has noted, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Phillips*, 959 A.2d at 437 (citing *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa.Super.2000)). In this case, Plaintiff's claim for civil conspiracy is based upon allegations that Defendants conspired to perpetrate a fraud against it. Because the Court finds that summary judgment is appropriate for

the fraud and concealment claim at Count I, no predicate cause of action exists upon which Plaintiff may assert a claim for civil conspiracy. Accordingly, summary judgment will be granted on Count II.

## C.  Count III: Breach of Fiduciary Duty

The Lint Defendants and Defendant Popely respectively move for summary judgment on Count III, the count which jointly and severally alleges a breach of fiduciary duty against all Defendants, on the basis that they did not have a fiduciary relationship with Plaintiff. *See* Doc. ## 41 & 43. The Court notes that there are different components to this claim, with separate allegations directed to the respective Defendants. The first component involves Defendant Popely, and charges that he had a fiduciary duty to his employer, which he breached to the detriment of Plaintiff. The second component involves Defendant Lint and the alleged participation in the breach of duties by Defendant Popely. As this Court noted previously in the Memorandum Opinion and Order denying Defendant Lint's motion to dismiss, Pennsylvania recognizes a cause of action for aiding and abetting a breach of a fiduciary duty.[9]  Doc. No. 19,

---

[9]       The Restatement (2d) of Torts, § 876, sets out the elements of a claim for civil aiding and abetting; one is subject to liability for harm to a third person from the tortious conduct of another when he:

    (a)    Does a tortious act in concert with the other or pursuant to a common design with him, or

    (b)    Knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or

    (c)    Gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*See Bancorp Bank v. Isaacs*, CA No. 07–1907, 2010 U.S. Dist. LEXIS 28282, *20, 2010 WL 1141336 (E.D.Pa. Mar. 25, 2010).

*Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Coverings*, CA No. 10–199, 2010 U.S. Dist. LEXIS 41173, *14,2010 WL 1714032 (W.D.Pa. Apr. 27, 2010).

The Court first considers Plaintiff's claim against Defendant Popely. A fiduciary duty exists when there is a "special relationship," which is one "involving confidentiality, the repose of special trust or fiduciary responsibilities." *eToll, Inc., v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa.Super.2002). As Defendant Popely notes in the brief in support of his motion for summary judgment, the elements which a plaintiff must prove to establish a claim for a breach of fiduciary duty were set out in *McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998). Specifically, a plaintiff must demonstrate the following:

> (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;
>
> (2) that the plaintiff suffered injury; and
>
> (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bringing about plaintiff's injuries.

*Id.* (*citing* Pa. S.S.J.I. § 4.16 (1991), since renumbered as § 6.210 (2003)); *see also Dinger v. Allfirst Fin., Inc.*, 82 Fed. Appx. 261 (3d Cir. Oct.30, 2008) (*citing McDermott*). Furthermore, a fiduciary relationship exists where one person places special confidence in another, either because one side has "overmastering dominance" or the other side has "weakness, dependence or justifiable trust," and the parties therefore do not deal with each other on equal terms. *Dinger*, 82 Fed. Appx. At 265 (*quoting Commonwealth Dept. of Transp. v. E–Z Parks, Inc.*, 153 Pa.Cmwlth. 258, 620 A.2d 712, 717 (Pa.1993)). This confidential relationship may be based on a business association, "only if one party surrenders substantial control over some portion of his [or her]

affairs to the other." *Id.* (internal quotations omitted). "When a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a fiduciary relationship." *Id.* (*citing Sutliff v. Sutliff*, 515 Pa. 393, 528 A.2d 1318, 1323 (Pa.1987)). An agent owes a duty to his principal "of loyalty in all matters affecting the subject of his agency, and the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Id.* at 627, 528 A.2d 1318 (internal quotations omitted).

The question therefore becomes whether there existed an agency relationship between Plaintiff, as the employer, and Defendant Popely, particularly with respect to the interactions with Defendant Edward Lint and Defendant Lint Tile. The Pennsylvania Supreme Court has outlined the parameters of a principal-agent relationship as follows:

> The law is clear in Pennsylvania that the three basic elements of agency are: "'the manifestation by the principal that the agent shall act for him, the agents's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Scott v. Purcell*, 490 Pa. 109, 117, 415 A.2d 56, 60 (1980), *quoting Restatement (Second) of Agency* § 1, Comment b (1958); *see also Reid v. Ruffin*, 503 Pa. 458, 463, 469 A.2d 1030, 1033 (1983). "Agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d 476, 480 (1971). The burden of establishing an agency relationship rests with the party asserting the relationship. *Scott*, 490 Pa. at 117 n.8, 415 A.2d at 61 n. 8. "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff*, 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987), *citing Restatement (Second) of Agency*, § 387 (1958). Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information. *See Sylvester v. Beck*, 406 Pa. 607, 610-11, 178 A.2d 755, 757 (1962).

*Basile v. H & R Block*, 563 Pa. 359, 761 A.2d 1115, 1120 (2000). When read selectively, such a definition of the concept of agency for the purpose of establishing a fiduciary relationship may extend to more general employer/employee relationships, especially with its invocations to

standards that include employees performing duties in good faith and working to further and advance the interests of the employer, as well as disclosing all relevant information the principal would consider relevant. In fact, Plaintiff utilizes aspects of this language in both the complaint, *see* Doc. # 1 at ¶ 57 ("... Popely was acting for his own benefit and not acting in the best interests of his employer"), as well as in its brief in opposition to the motions for summary judgment, *see* Doc. # 51 at § III.C. (Defendant Popely concealed "the material fact that Lint was not going to pay the invoices within a reasonable time and that Ed Lint was advocating an interpretation of the marketing support agreement that clearly differed from the marketing support agreement as understood with Laufen", and that "Laufen was clearly harmed by Popely's concealments, in that they prevented Laufen from properly addressing its relationship with Lint and prevented Laufen from avoiding the harm that resulted in trying to appease Lint and giving Lint the Lowe's deal.")

Such conduct, however, is of no legal import to a breach of a fiduciary duty claim unless there exists the requisite fiduciary relationship. As the Pennsylvania Supreme Court stressed, not all acts on behalf of another give rise to an agency relationship:

> The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties, such as binding the principal to a contract. Notably, the Restatement, which we have cited with approval in this area in the past, specifically recognizes as much. *See Restatement (Second) of Agency* § 12 ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.").

*Id.* at 1121.  In this case, there is no evidence to support the notion that Defendant Popely ever had such power or authority to commit Plaintiff to certain obligations when it came to its interactions with Lint Tile.  To the contrary, the authority to negotiate terms of the agreement with Lint Tile rested at a level above Defendant Popely, specifically with Jorge Torres, and not with Popely himself.  The evidence contained within the record, including the sequence of email correspondence that occurred between Defendants Edward Lint and Popely, does nothing to establish a fiduciary duty.  Even if the evidence did establish that a fiduciary duty existed, which it does not, there is no evidence of any breach of that duty.  There is no evidence to show that anything Defendant Popely allegedly did in the course of, or as a result of, his email correspondence with Defendant Lint altered Plaintiff's relationship with the Lint Defendants.  Accordingly, summary judgment will be granted for all Defendants on Count III.

**D. Count IV: Interference with contractual relations**

The Lint Defendants and Defendant Popely move for summary judgment on Count IV, the count directed against all defendants alleging a tortious interference with contractual relations.  In Pennsylvania, the cause of action for malicious interference with contract is defined in the Restatement (Second) of Torts § 766.  This section of the Restatement, which was adopted by the Pennsylvania Supreme Court in *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1 A.L.R.4th 1144 (1978), cert. denied, *Epstein v. Adler, Barish, Daniels, Levin and Creskoff*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), provides as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766; *see also Daniel Adams Associates, Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa.Super. 1987). A right of recovery under this section requires the existence of a contractual relationship between a plaintiff and a "third person" other than the targeted defendant. *See Daniel Adams Assoc.*, 519 A.2d at 1000 (citations omitted). By definition, this tort necessarily involves three parties, with the tortfeasor alleged to be one who intentionally and improperly interferes with a contract between the plaintiff and a third person. *Id.* "It is well settled that a corporation cannot tortiously interfere with a contract to which it is a party." *Nix v. Temple Univ.*, 596 A.2d 1132, 1137 (Pa.Super. 1991).

The Lint Defendants argue that Plaintiff's allegations in this respect involve the merchandising support agreement reached on June 28, 2007, an agreement to which Plaintiff and Defendants were parties. *See* Doc. # 41 at § VI. For his part, Defendant Popely argues that at no time while employed with Plaintiff did he interfere with the contractual relationship between Laufen and Lint Tile; to the contrary, that he acted at all times in the best interests of Laufen by attempting to further and strengthen the relationship between the two in order to collect his commission. *See* Doc. # 43 at § III.D. In responding to the motions for summary judgment, and in the interest of narrowing the issues, Plaintiff withdraws that claim. Doc. # 51 at § III.C. Accordingly, the Court will enter summary in favor of all Defendants on Count IV.

## Conclusion

For the hereinabove stated reasons, the Court will grant in part and deny in part Doc. # 39, the MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS LARRY J. LINT FLOOR & WALL COVERING CO., INC., AND EDWARD LINT. Summary judgment will be

granted with respect to Counts I, II, III, and IV of Plaintiff's complaint (Doc. # 1), and denied

with respect to Count V, the breach of contract claim.

Further, the Court will grant in its entirety Doc. # 40, the MOTION OF JOHN G.

POPELY FOR SUMMARY JUDGMENT.   An appropriate order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LAUFEN INTERNATIONAL, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) 2:10-cv-199 |
| **v** | ) |
| | ) |
| **LARRY J. LINT FLOOR & WALL COVERING,** | ) |
| **CO., INC., JOHN G. POPELY** | ) |
| **and EDWARD LINT.** | ) |
| | ) |
| **Defendant.** | ) |

### ORDER OF COURT

AND NOW, this 11th day of January, 2012, it is hereby **ORDERED, ADJUDGED AND DECREED** that the MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS LARRY J. LINT FLOOR & WALL COVERING CO., INC., AND EDWARD LINT, Doc. # 39, is **GRANTED IN PART and DENIED IN PART**. Summary judgment is **GRANTED** with respect to Counts I, II, III, and IV of Plaintiff's complaint (Doc. # 1), and is **DENIED** with respect to Count V.

IT IS FURTHER ORDERED that the MOTION OF JOHN G. POPELY FOR SUMMARY JUDGMENT (Doc. # 40) is **GRANTED** in its entirety, and Defendant John G. Popely is **DISMISSED** from this action.

The caption of this action is hereby amended to read as follows:

| | |
|---|---|
| **LAUFEN INTERNATIONAL, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:10-cv-199** |
| **v** | ) |
| | ) |
| **LARRY J. LINT FLOOR & WALL COVERING,** | ) |
| **CO., INC.** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

IT IS FURTHER **ORDERED** that Plaintiff shall file a Pretrial Narrative Statement on or before **February 1, 2012**. Defendant shall file a Pretrial Narrative Statement on or before **February 22, 2012.**

The Court will conduct a pretrial conference on **Friday, March 2, 2012, at 2:00 p.m.** in Courtroom 6C, 6th Floor, U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania 15219. Counsel shall instruct their clients or principals to attend or be available by telephone to facilitate the amicable resolution of the litigation. **Trial counsel must attend**.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Dennis R. Callahan, Esquire
Email: dcallahan@dallergreenberg.com
John P. Liekar , Jr., Esquire
Email: jliekar@ymlz.com
Mark E. Ulven, Esquire
Email: mulven@hrslaw.com