IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUFEN INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:10-cv-199 |
| v | ) |
| | ) |
| LARRY J. LINT FLOOR & WALL COVERING, | ) |
| CO., INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER OF COURT

Pending now before the Court is DEFENDANT'S MOTION IN LIMINE, filed by Defendant Larry J. Lint Floor & Wall Covering Co., Inc. ("Lint Tile") at Doc. # 57, and LAUFEN'S RESPONSE IN OPPOSITION OF DEFENDANT'S MOTION IN LIMINE (Doc. # 65). The motion is ripe for disposition. For the reasons that follow, Defendant's motion will be granted in part and denied in part.

### STATEMENT OF THE CASE

Generally speaking, this case is a commercial breach of contract action involving the sale of goods.[1] Plaintiff Laufen International, Inc. ("Laufen") is a manufacturer of tile and has its principal place of business in Miami, Florida.[2] Doc. No. at ¶ 1. Defendant Lint Tile is a

---

[1] Originally, the complaint also contained claims sounding in tort stemming from allegations involving two individually named Defendants. Following this Court's determination on Defendants' motions for summary judgement, those individual Defendants were granted summary judgment as to the tort claims, and all that remains is the breach of contract claim and counterclaim. *See* Doc. No. 52.

[2] Laufen International, Inc., is one of several companies owned by a Spanish company called Roca Tile Group. Doc. # 42 at ¶ 1. At some point during the 1990s, Plaintiff Laufen acquired United States Ceramic Tile, an Ohio-based ceramic tile manufacturing company. *Id.* at ¶ 2. Thereafter, Roca acquired Laufen in 1999. Doc. # 48 at ¶ 2.

wholesaler and distributer of tile and has its principal place of business in Westmoreland County, Pennsylvania. *Id.* at ¶ 2. The claims contained in the complaint and the counterclaim arise from the previous commercial relationship of the parties that began in 2007. On or about March 25, 2007, Defendant Lint Tile submitted a credit application to Plaintiff in order to establish the ability to purchase Plaintiff's tiles and other goods on credit. At the time, John Popely was employed by Plaintiff, and handled the Lint Tile account. In the course of conducting those responsibilities, Popely would communicate with Edward Lint, who manages Lint Tile and is the son of Larry J. Lint, the owner of Lint Tile. As a Laufen employee, Popely reported to Jorge Torres, the company's vice president of sales. Throughout 2007, Plaintiff and Defendant engaged in a number of commercial arrangements, including the purchase and shipment of tile orders beginning in and around May 2007. Additionally, and directly at issue in the matter *sub judice*, Plaintiff and Lint Tile reached a marketing support agreement on or about June 28, 2007.

The terms of the June 28, 2007 agreement between Laufen and Lint Tile are at the heart of the breach of contract dispute. In terms of the actual format of the agreement, it was apparently a single page document that was exchanged between the parties via facsimile transmission, and was signed by Popely on behalf of Plaintiff Laufen. Popely described the agreement as Lint Tile "was going to purchase so much material, in return [Plaintiff] was going to supply him some merchandising material." *See* Doc. # 48, Popely Depo. Tr. at Tr. p. 35. Relevant to Defendant's Motion in Limine, different versions of that writing were included within the evidentiary record at the summary judgment stage, and the parties disagree over which particular document memorialized the actual agreement. There is no dispute, however, that in either "version" of the agreement, Laufen offered several types of merchandising material

support to Lint Tile, such as the purchase and installation of display racks in the Lint facility, and 500 sets of tile sample boards to display the various types of Laufen tile being sold to Lint Tile for resale under Lint Tile's own brand name. The display racks were installed at Lint Tile at an alleged cost to Plaintiff of $300,000.00. The sample boards, on the other hand, required more time to produce, and were manufactured by a third-party corporation, Brown Industries, Inc., in Georgia.

Plaintiff identifies a specific document that had been signed by Popely which sets forth a number of terms constituting the agreement (identified within the evidentiary record as Popely Deposition Exhibit 1, or "Popely Exhibit 1"). *See* Doc. # 48, Laufen's Response to Lint's Concise Statement of Material Facts at ¶ 20; *see also*, exhibit 12 to Laufen Response. During his deposition, Popely identified Popely Exhibit 1 as the written agreement. The Court notes that the upper segment of Popely Exhibit 1 contains the following:

```
ORDER
$                            2,500,000
                                              New Offer
                                Description              Estimated Value
                                No discount
Pricing
Merchandising                   500 nicer displays       $500,000
Additional Marketing Support (rebate)  10%               $250,000
Terms                           5%                       $64,167
-----------------------------------------------------------------------
Total Promotion Value                                    $814,167
% of First Order                                         32.6%
% of Proj. One Year Sales                                17.6%
```

*Id.* Below this upper segment of the agreement, the following type-written terms were included:

Orders that are shipped out of Roca warehouses Lint Tile will only charged $150

Roca will pay for racking system (Lint Tile will Give Roca Invoice) $25,000 to $30,000

Roca will honor the 5% rebate for 1 year from the date of invoice

Roca will pay for a trip for Larry Lint which would be used within 1 year. Hunting Trip

> $20,000 to $30,000
>
> Roca will co-op 50% of a sale training seminar
>
> If Lint Tile places the USCT orders by June 29 no later than 3:00 PM Roca will by [sic] Lint Tile a $25,000 Truck
>
> This proposal is final and Roca will not RENEGE

Doc. # 48, Exhib. 12 to Plaintiff's Response to Lint Concise Statement of Material Facts ("Popely Exhibit 1").

Defendant Lint Tile, on the other hand, identifies an alternative version of the agreement, referenced throughout the record as Lint Deposition Exhibit 4 ("Lint Exhibit 4"), as being the actual agreement. *See* Doc. # 55, Defendant's Pretrial Statement at Exh. B (a copy of which was included in Defendant's filings as part of the evidentiary record at summary judgment). Similar to Popely Exhibit 1, Lint Exhibit 4 is generally organized into upper and lower segments. *See* Doc. # 39, Lint Exhibit 4, attached to Lint's Concise Statement of Material Facts at exhibit 5. The upper segment of Lint Exhibit 4 is identical to the upper segment of Popely Exhibit 1. The lower segment of Lint Exhibit 4, however, does not include the same listing of typed terms; instead, it reflects the following three typed terms, followed by four handwritten terms allegedly written by Popely:

> All prices at East Coast prices, but delivered to Pittsburgh Container Yard.
>
> 500 displays will be used for several years as new Lint Tile program. For return on investment one year consider [sic]
>
> Interest rate considered at 5%.
>
> Roca will pay for Racks for the Roca Room.   30,000
>
> Co-op a training Seminar which will be held soon.
>
> Hunting trip for Larry to be determined at later date.

```
Aprox. [sic] 20,000 - 30,000.

5% rebate for payment within 1 year of the date receiving
material
```

*Id.* Under these terms was additional language, presumably handwritten by Lint, that stated: "of displays and samples not tile. 6-26-07. Ship display first." *Id.* Lint Exhibit 4 allegedly bears the signature of Popely.[3]

Generally speaking, there is little variation between the handwritten terms of Lint Exhibit 4 and the typed language of Popely Exhibit 1, as both contain references to a racking system, a 5% rebate, and a hunting trip for Defendant Lint's father Larry. The significant difference between the two is the handwritten addendum to the 5% rebate term of Lint Exhibit 4 in which Edward Lint included language regarding Plaintiff's obligation to ship the displays and samples before the one year time frame within which the rebate would accrue.

As noted above, the sample boards were manufactured by Brown Industries. The custom display racks were completed and shipped to Lint Tile between October and early November, 2007. The cost of the manufacture and freight to ship the displays to Lint Tile were paid by Laufen, and totaled slightly more than $300,000.00. The manufacture of the sample boards for Lint Tile were based upon specifications provided by Edward Lint, including dimensions

---

[3] Defendant's counterclaim is predicated upon these handwritten terms, especially the language written by Edward Lint himself purportedly prior to the agreement being reached. According to Edward Lint, "I wrote on the paper that Lint Tile's payment to [Plaintiff] was not due until one year after receiving 'displays and samples not tile.'" Doc. # 39-9, Lint Affidavit. Edward Lint also testified as to his understanding under the agreement, that he was "supposed to buy tile, they were supposed to give me 500 sets of boards, 500 sets of samples, I pay for everything after I receive all my sample boards and displays. A year after I received the sample boards and displays, I pay for them. Case closed, that's the deal." Doc. # 50, Depo. Tr. of Lint at Tr. p. 49.

corresponding to the display racks and graphics of Lint Tile images. The order originally envisioned 12,500 boards, as each of the 500 sets of boards were to be comprised of 25 sample boards. The manufacture of each board occurs in different phases, the printing phase of the board itself, followed by the sampling phase, during which the tile samples are cut to size and attached to the boards.

The manufacture and production of the sample display boards were beset by a number of occurrences that affected the time required to produce them. Some of these occurrences can be categorized as logistical in nature in that they occurred within the course of bringing the necessary materials together at the same time in order to create the boards. For example, the artwork for the boards was not generated by Brown Industries itself, but was provided to them. For some tile series, there was a delay with Brown receiving the artwork, including not receiving the artwork at all for certain series, which either delayed or precluded the creation of boards. Likewise, it appears that some delay was associated with the shipment of the tile to be attached to the boards from either Laufen or Lint Tile to Brown. While the arrangement originally involved the tile to be used in the sample display boards being provided to Brown by Laufen, Lint Tile shipped certain tile samples to Brown at the request of Laufen. Breakage occurred with the shipment of certain tile samples, which required replacement.

Other factors which affected the manufacturing process appear to stem from the disagreement between the parties regarding who would pay the freight charges associated with shipping the boards to Lint Tile. Defendant Lint Tile expected Plaintiff to pay the freight charges, while Plaintiff Laufen contends that it was the responsibility of Lint Tile to do so. As the result of a combination of these factors, in the 12 - 18 months that followed the June 28, 2007

agreement, Brown Industries shipped less than a total of 100 sets of sample boards to Lint Tile. It is unclear who paid for those deliveries, however (apparently it was either Plaintiff or Brown Industries itself). What is clear is the fact that the Lint Defendants did not pay for the freight of those sets that were delivered. The sets of boards that were manufactured by Brown Industries and not shipped to Lint Tile were stored in Brown's warehouse. By 2008, so many sets of sample boards were stored at Brown that it was unable to manufacture any additional boards until those that had been produced were shipped.

On January 11, 2012, this Court granted in part and denied in part Defendants' motions for summary judgment that were filed at Doc. ## 39 and 40. Doc. # 52. Summary judgment was granted with respect to Counts I - IV of Plaintiff's complaint, and Edward Lint and John Popely, who had been individually named as Defendants, were dismissed from the action. *Id*. The parties have since filed their respective pre-trial documents, and trial is scheduled to commence on May 7, 2012.

## ANALYSIS

With its motion in limine, Defendant Lint Tile makes the following arguments:

1. The exclusion from use at trial of emails that Plaintiff argued were evidence supporting Plaintiff's tort claims against Edward Lint and John Popely, on the basis that summery judgment was entered on behalf of Popely and Lint on the tort claims, and therefore, are irrelevant to the determination of any fact of consequence that remains in this action;

2. The preclusion of Jorge Torres from testifying as an expert witness due to Plaintiff's failure to meet the requirements of Fed.R.Civ.P. 26(a)(2) regarding disclosure of expert testimony;

3. The preclusion of Jason Incarnato from testifying based on the failure of his affidavit to show he has any knowledge relevant to the determination of a material issue in this case;

7

> 4. The exclusion of other evidence that is irrelevant, or that will cause confusion, undue delay, or needless presentation of cumulative evidence.

Doc. # 57. In response, Plaintiff contends that Defendant's motion should be denied in its entirety, and individually addresses each of the four issues raised by Defendant. The Court will address each request *ad seriatim*.

    a.    Email Correspondence Between Edward Lint and John Popely

On February 1, 2012, Plaintiff filed a pre-trial statement wherein it identified 148 potential exhibits to be introduced at trial, a significant number of which are printed copies of email correspondence messages and sequences of messages ("email chains"). Doc. # 54. Defendant contends that a certain number of these proposed exhibits were only advanced by Plaintiff as "evidence of a conspiracy by Ed Lint and John Popely to defraud Plaintiff." Doc. # 57. As such, and "[i]n light of the dismissal of Plaintiff's tort claims, [Defendant contends that] the emails that Plaintiff argued were evidence of fraud are irrelevant, i.e., they no longer have any tendency to make the existence of any fact that is of consequence to the determination of the Plaintiff's breach of contract claim more probable or less probable than it would without the evidence." *Id.* In particular, Defendant identifies several exhibits containing email discussions between Lint and Popely, who was employed by Plaintiff Laufen at the time, regarding Popely switching employers and working for Defendant Lint Tile. *Id.* (referencing Plaintiff's Pre-Trial Exhibits 7, 19, 20, 21, 22, 39, 40, 53, and 56 identified in Doc. # 54). Defendant argues that such communications have no connection to the breach of contract claims that remain in this action. *Id.* Likewise, Defendant challenges the relevance of the following Pre-Trial Exhibits: an internal email regarding sales Popely made to other customers in 2007 (Ex. 78), a request from Edward

8

Lint for Popely to ride with some of the sales representatives (Ex. 93), and an email about tile that Edward Lint could not locate (Ex. 94). Defendant contends that other exhibits were offered to demonstrate the alleged tortious kickback scheme between Lint and Popely (Exs. 10, 11, 51, 52 , and 55), and evidence that Popely shared Plaintiff's confidential information with Lint (Ex. 18). Defendant argues that said exhibits are not relevant following the Court's entry of summary judgment as to the tort claims against Lint and Popely, and even if they were relevant, any probative value for the exhibits would be substantially outweighed by the likelihood of unfair prejudice, confusion of the issues, or the potential to mislead the jury. Doc. # 57.

Plaintiff opposes the motion to exclude this information prior to trial. In particular, it acknowledges that the only claims that remain are the breach of contract claim and counterclaim, and represents to the Court that it will "appropriately narrow its presentation of the evidence to issues relevant" to said claims. Doc. # 65. Beyond that, Plaintiff argues that the exhibits identified by Defendant may be relevant for the purpose of demonstrating either bias of a witness, or other basis of impeachment of a witness' credibility at trial. *Id*.

On one level, the Court can understand Defendant's initial reaction to the itemization of exhibits by Plaintiff in its Pre-Trial Statement. Extending beyond the standard of thorough preparation for trial, for some reason, Plaintiff has included, *inter alia*, duplicate email chains as separately identified exhibits. For example, Plaintiff's Pre-Trial Exhibit (Ex.) 7 is identical to Ex. 40. Ex. 10 is identical to Ex. 52. Ex. 11 is identical to Ex. 55. Ex. 21 is identical to Ex. 56. Further, the single email message that is Ex. 39 is included within the email chain at both Exs. 7 & 40. Similarly, the email message that is Ex. 51 is included within the email chain at Ex. 10. Nevertheless, duplication in the Pre-Trial Statement is a far cry from issues of admissibility at

trial. As Plaintiff correctly notes in its brief in opposition, "'[p]roof of bias is almost always relevant,' because a 'showing of bias on the part of a witness would have tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony.'" Doc. # 65 (quoting *United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010)(internal quotations omitted)). In that respect, the Court agrees with Plaintiff that Defendant's blanket request for exclusion of these exhibits based upon its conclusory assertion that such evidence is either not relevant or overly prejudicial is premature. As such, Defendant's request for the exclusion from use at trial of the Pre-Trial Exhibits identified in its motion in limine will be denied without prejudice. The relevance and admissibility of these voluminous exhibits will be closely scrutinized at trial and not admitted if irrelevant or violative of Fed.R.Evid. 403.

      b.      The Testimony of Jorge Torres as a Purported Expert

Attached to Plaintiff's Pre-Trial Statement was document identified as an expert report from Jorge Torres. Doc. # 54 at Ex. A. The document challenged by Defendant is a spreadsheet documenting the amount that Plaintiff contends is owed to it by Defendant. *Id*. Defendant moves to preclude Torres from testifying as an expert on the basis that the report does not meet the requirements of Fed.R.Civ.P. 26(a)(2) for disclosure of expert testimony. Doc. # 57. Among other things, Rule 26 requires parties to disclose the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705. Generally speaking, Fed.R.Evid. 702 permits an expert witness to provide opinion testimony based upon the witness' knowledge, skill, experience, training, or education. Rule 703 provides for the basis of the experts opinion, while Rule 705 permits an expert to provide opinion testimony, and the reasons

for such an opinion, without disclosing the underlying facts or data relied upon in forming that opinion.

Precision at this juncture is important because the filings with regard to this issue appear to contain gaps between that which each respective party seeks, and the means by which they advance their positions. Apparently, Defendant is not seeking to preclude the testimony of Torres outright, only that Torres not be permitted to provide opinion testimony as an expert. Doc. # 57. Of course, the means by which Defendant seeks such relief is through the challenge of the so-called expert report spreadsheet as insufficient under Rule 26. *Id*. at 3-4 ("It is not signed by the witness, does not include any information concerning the witness's qualifications, and does not contain a statement of the opinion the witness will express and the basis and reasons for them. Accordingly, *Plaintiff should not be permitted to offer Mr. Torres as an expert*.")(emphasis added) Likewise, Plaintiff opposes the preclusion of Torres' testimony on the basis that Torres has first hand knowledge of the information contained within the spreadsheet, and that the report requirements of Fed.R.Civ.P. 26 are not required in situations in which employees testify as fact witnesses "even though their involvement in the events in suit, or testimony about those events, may depend on the witness's expertise." Doc. # 65 at 3. At the same time, Plaintiff concedes that the testimony regarding how much Plaintiff believes it is owed, including interest, does not require expert testimony, and is typically not beyond the ken of the average layman such that it would require the opinion of an expert. Doc. # 65.

Both parties are correct to a point. There is no basis for the Court to preclude Torres from testifying as a fact witness. Similarly, to the extent that a proper foundation is laid, he will be able to testify to the amount of Plaintiff's alleged loss as a measure of the damages Plaintiff

contends it has suffered. There is nothing before the Court to suggest that the calculation of such loss requires an expert opinion, and a review of the spreadsheet is itself simple arithmetic that chronicles dates of transactions and invoices, and balances due on each occasion. The Court finds that such report does not set forth an expert opinion. Rather, it is more akin to a historical summary of transactional evidence. There is nothing of record to suggest, let alone establish, that Torres is an expert qualified to render opinion testimony regarding Plaintiff's alleged damages. He may be a witness who can testify to the facts contained in the spreadsheet, but likely not opinions related thereto. Defendant's motion to preclude Jorge Torres from presenting opinion testimony as an expert will be granted.

    c.       Testimony of Jason Incarnato and the Alternative Version of the Agreement

Defendant moves to preclude the testimony of witness Jason Incaranto. He is employed by Plaintiff Laufen as its IT Support Manager, and has provided an affidavit with respect to a search of email correspondence between Laufen and Edward Lint.

A brief explanation of the context in which Incarnato's affidavit would fit within this action is in order. As Plaintiff points out, there are three versions of the agreement that have been identified within the record, two opposing versions referenced respectively by Plaintiff and Defendant, as well as one alternative of Defendant's version of the agreement that has been identified by Plaintiff for the purpose of impugning Defendant's version. Each of these competing versions were included in the evidentiary record in the course of summary judgment and have been identified by the parties as prospective exhibits at trial. "Popely Exhibit 1" is the version of the agreement that Plaintiff contends is the actual marketing support agreement. That is the agreement with the typed terms and bearing the signature of Popely that was faxed to

Defendant on June 28. 2007.   Defendant, on the other hand, identifies "Lint Exhibit 4" as the agreement.  That is the document with the handwritten terms and also allegedly bears a signature of Popely.  The third is the "Unsigned Emailed Version", which is proffered through the Incarnato affidavit, and apparently came from an email message sent by Edward Lint to Laufen employee Jenn Turowski on November 15, 2007.  Doc. # 65.  In its opposition to Defendant's motion for summary judgment, Plaintiff included an affidavit from Incarnato, who attested to the fact that in the course of conducting a search of Plaintiff's email systems in order to locate messages associated with Lint Tile or Edward Lint, he located the November 15, 2007 email sent to Turowski from Edward Lint.  *See* Doc. # 48 at Ex. 14.   The attachment to that email appeared to be a color scan of a two page document, the first page of which was Popely Exhibit 1, and the second page was the unsigned version of Lint Exhibit 4.  *Id*.  Incaranto's affidavit, including printed copies of the email message itself as well as the two page attachment to the email, has been included in Plaintiff's Pre-Trial Statement as a proposed exhibit.  *See* Doc. # 54 at ¶ E.13.

Defendant moves to preclude the introduction of the Incarnato affidavit at trial on the basis of hearsay, and the trial testimony of Incarnato on the basis of relevance.   Doc. # 57 at 4 -5. Plaintiff opposes Defendant's motion in this regard, and contends that the evidence of Incarnato is relevant to the question of which of the alternative versions of the agreement even applies to the question at issue in the trial.  Plaintiff notes that, given the fact that the agreement between the parties is subject to the UCC, it must therefore satisfy the statute of frauds. Doc. # 65 (citing *Getty Petroleum Mktg., Inc. v. Shipley Fuels Mktg., LLC*, CivA.No. 07-cv-340, 2007 WL 2844872 (ED Pa. Sept. 27, 2007), *aff'd*, 293 F.App'x 166 (3d Cir. 2008).  As noted above, it is Plaintiff's position that Popely Ex. 1 represents the written agreement.  Defendant's position, at

least through the summary judgment stage, was the Lint Ex. 4 represented the agreement. In essence, Plaintiff challenges the authenticity of Defendant's version of the agreement ("Lint Exhibit 4") on the basis that it could not have represented the agreement because if the evidence provided by Incarnato is believed, the document advanced by Defendant appears to have not been signed until at least a time after the email was sent to Turowski some four months following the June 28, 2007 date of Popely Ex. 1.

The Court finds that the evidence to be offered through Incarnato may be relevant to the issue of the terms of the agreement between the parties, and that his testimony should not be precluded pretrial. Of course, his testimony is relevant conditioned upon facts that have not yet been established, namely its relevance is only in relation to the extent to which Defendant introduces its purported version of the agreement ("Lint Ex. 4"). Nevertheless, a decision at this juncture regarding such evidence would be premature. Accordingly, Defendant's motion to preclude the testimony of Incarnto or the affidavit of Incarnato will be denied without prejudice.

        d.        Other Evidence

Defendant seeks to exclude 58 exhibits on the basis that such exhibits are irrelevant, or will otherwise cause confusion, undue delay, or needless presentation of cumulative evidence. Doc. # 57 at 7 - 8. Plaintiff responds that any determination with respect to the admissibility of documents should be made at trial and within the context of a witness' testimony. While the Court can understand Defendant's concern, especially given that fact that Plaintiff's list of pre-trial exhibits includes different entries for duplicate exhibits, the question of admissibility, or objections thereto, cannot be made at this juncture. It should go without saying that consistent with the rules of evidence, neither party will be permitted to present irrelevant or needlessly

cumulative evidence. Beyond that, the Court will deny Defendant's motion without prejudice.

## CONCLUSION

In accordance with the foregoing, DEFENDANT'S MOTION IN LIMINE, Doc. # 57, will be granted in part and denied in part. An appropriate order follows.

McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAUFEN INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:10-cv-199 |
| v | ) |
| | ) |
| LARRY J. LINT FLOOR & WALL COVERING, CO., INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this 27th day of April, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that DEFENDANT'S MOTION IN LIMINE, Doc. # 57, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that Mr. Jorge Torres will not be permitted to provide testimony in the form of an expert opinion. The motion is DENIED WITHOUT PREJUDICE in all other respects.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Dennis R. Callahan, Esquire
Email: dcallahan@dallergreenberg.com
John P. Liekar, Jr., Esquire
Email: jliekar@ymlz.com
Mark E. Ulven, Esquire
Email: mulven@hrslaw.com